**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CECIL MAX-GEORGE, TDCJ #01649987, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-17-2264 |
| | § | |
| HOUSTON POLICE DEPARTMENT, *ET AL.*, | § | |
| | § | |
| *Defendants.* | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, a state prisoner proceeding *pro se* and *in forma pauperis*, filed an amended section 1983 lawsuit against the City of Houston and Houston Police Department ("HPD") officers C.A. Myrick, J. Mejia, and L. Matthews (the "Defendant Officers"). (Docket Entry No. 51.) The Defendant Officers filed a motion for summary judgment (Docket Entry No. 52), to which plaintiff filed a response (Docket Entry No. 66).

Additionally, the defendant City of Houston and the Defendant Officers filed a motion to dismiss the amended complaint (Docket Entry No. 63). Defendants timely mailed a copy of the motion to plaintiff at his address of record, but plaintiff has not filed a response or requested leave to file a response.[1]

---

[1] The Court referenced the pending motion to dismiss in its order dated January 21, 2020 (Docket Entry No. 75). Moreover, in denying plaintiff mandamus relief, the Fifth Circuit Court of Appeals advised plaintiff that, "if Max-George was not properly served by the defendants with certain pleadings, these are matters that should be addressed to the district court in the first instance." *In Re: Cecil Max-George*, No. 20-20060 (5th Cir. Aug. 24, 2020). Plaintiff has not complained to this Court that he did not receive a copy of the motion to dismiss, and he has waived any such complaint at this late date.

Having considered the motions for summary judgment and to dismiss, the response, the record, matters of public record, and the applicable law, the Court GRANTS the motion for summary judgment, GRANTS IN PART and DENIES IN PART the motion to dismiss, and DISMISSES this lawsuit for the reasons shown below.

### Background and Claims

On July 20, 2015, plaintiff was driving his pick-up truck in Houston, Texas, when the defendant Officer Myrick and Officer Duval[2] pulled him over on open warrants for his arrest. As defendant Officer Myrick approached the driver's side door, plaintiff began swearing and demanding to know why he had been pulled over. Myrick asked plaintiff to calm down, but he continued to curse and scream. Nevertheless, Myrick was able to verify that plaintiff was the person named in the outstanding warrants. After plaintiff refused to get out of the vehicle when asked to do so, the officers returned to their patrol vehicle and called for back-up. *See Max-George v. State*, 2017 WL 3270987, at *1 (Tex. App. – Houston [14th Dist.] 2017, no pet.).

Defendant Officers Matthews and Mejia, and non-defendant Officer Callahan, responded to Myrick's request. Matthews approached plaintiff requesting everyone to stay calm, but plaintiff continued screaming and cursing. *Id*. Matthews opened the driver's door and attempted to place handcuffs on plaintiff, but plaintiff knocked Matthews's hand away and grabbed Matthews by the vest. *Id*. A struggle ensued as the officers removed plaintiff

---

[2]The Court earlier dismissed Officer Duval as a defendant in this lawsuit pursuant to *Heck v. Humphrey*, 512 U.S. 377 (1994).

from the vehicle, put him on the ground, and handcuffed him. During that struggle, two of the officers were injured. *Id*.

Plaintiff complains he sustained bruises, a cut on his ear, busted lip, bloody nose, and taser marks on his legs, chest, and lower abdomen. Myrick called EMS to the scene, but plaintiff states he was not examined. Plaintiff was booked into jail, but he complains jail medical staff offered no medical treatment.

Plaintiff was charged with, and found guilty of, assault of a public servant (Officer Duval) as a result of the incident. *Id*. The Defendant Officers testified at trial that no videotape of the incident was available, as their police vehicles and uniforms were not yet equipped with videocam equipment in 2015. (Docket Entry No. 52-4, p. 61.) Myrick testified at trial that the entire incident, from plaintiff's initial physical resistence to his arrest, took about five minutes. *Id*., p. 63. The parties all rely on testimony from the trial in presenting their respective arguments in the instant proceedings.

Plaintiff claims that the Defendant Officers used excessive force, denied him medical attention at the scene, violated federal and state criminal laws, the Texas Tort Claims Act, and federal civil conspiracy laws. He further argues that the City of Houston racially profiled black men and practiced and promoted an unwritten policy of allowing use of excessive force against black men, in violation of his equal protection rights. He seeks declaratory, injunctive, and compensatory relief against the City of Houston and the Defendant Officers.

### *Motion to Dismiss*

Defendants City of Houston, Myrick, Mejia, and Matthews filed a motion to dismiss plaintiff's amended complaint (Docket Entry No. 63).  As noted earlier, plaintiff has not filed a response to the motion.  In the interest of justice, and because the grounds are substantially unchanged, the Court has reviewed plaintiff's response (Docket Entry No. 47) to the Defendant Officers' partial motion to dismiss (Docket Entry No. 42), and finds that it presents no meritorious grounds for denying the pending motion to dismiss.

### *Violation of Criminal Statutes*

Construed liberally, plaintiff's amended complaint seeks relief against the defendants for violations of the Federal Criminal Code, 18 U.S.C. §§ 241, 242 (criminal conspiracy and deprivation of rights under color of law) and Texas Penal Code sections 36.02, 36.06, 39.03, and 39.04 (abuse of official capacity, obstruction or retaliation, official oppression, and violations of the civil rights of a person in custody).  However, these are criminal statutes that do not create a private right of action, and a private citizen has no constitutional right to have someone criminally prosecuted. *See Ali v. Shabazz*, 8 F.3d 22, 22 (5th Cir. 1993); *see also Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990).

Nor may a private citizen pursue civil damages for the violation of a criminal statute, except under very limited circumstances.  The Fifth Circuit Court of Appeals has explained that, "for a private right of action to exist under a criminal statute, there must be 'a statutory basis for inferring that a civil cause of action of some sort lay in favor of someone.'" *Ali*, 8 F.3d at 22.  Because there is nothing in 18 U.S.C. §§ 241 and 242 indicating that they are

more than "bare criminal statutes," they do not provide for a private right of action.  *Id*. Likewise, the Texas Penal Code provisions do not create a private cause of action.  *Bryant v. CIT Grp. Consumer Fin., Inc*., 303 F. Supp. 3d 515, 524 (S.D. Tex. 2018); *Hamilton v. Pechacek*, 319 S.W.3d 801, 813 (Tex. App.—Fort Worth 2010, no pet.).

Because these state and federal criminal statutes provide plaintiff no basis for relief under section 1983, his claims predicated on violation of the statutes are DISMISSED WITH PREJUDICE.

*Federal Civil Conspiracy*

Defendants seek dismissal of plaintiff's claim for civil conspiracy brought under 42 U.S.C. § 1985(3).  Plaintiff's claim will be dismissed because he has not alleged facts supporting the essential elements of such a claim.

"To state a claim under § 1985(3), a plaintiff must allege facts demonstrating (1) a conspiracy; (2) for the purpose of depriving a person of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or a deprivation of any right or privilege of a citizen of the United States." *Hilliard v. Ferguson*, 30 F.3d 649, 652–53 (5th Cir. 1994). The factual allegations must show that the conspiracy was motivated by racial animus.  *See id.* at 653.

Conclusory allegations of racial discrimination cannot support a cause of action under section 1985(3).  *See Hamilton v. Service King Auto Repairs*, 437 F. App'x 328 (5th Cir. 2011); *Webber v. Bureau of Prisons*, 198 F. App'x 406 (5th Cir. 2006).  Plaintiff alleges here that the Defendant Officers conspired "to forcibly remove Plaintiff from his truck" in

retaliation "for making a crude remark or statement to Defendant Myrick." This conclusory assertion is insufficient to raise a viable claim for conspiracy, discrimination, or to show racial animus.

Moreover, Fifth Circuit precedent holds that a governmental entity and its employees constitute a "single legal entity which is incapable of conspiring with itself" for purposes of section 1985(3). *See Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998) (quoting *Hilliard*, 30 F.3d at 653). The Defendant Officers in this lawsuit were employees of the City of Houston acting in the course and scope of their employment as HPD police officers at the time of the events alleged. Therefore, and as a matter of law, no conspiracy existed. Further, because the purported conspiracy was allegedly motived by retaliation, not by racial animus, there are no factual allegations showing racial animus or discrimination, and no viable section 1985(3) claim is raised. *See Hilliard*, 30 F.3d at 653.

Plaintiff's section 1985(3) claim for civil conspiracy is DISMISSED WITH PREJUDICE.

*Heck Bar*

Defendants contend that plaintiff's claims for excessive force are barred by *Heck v. Humphrey*, 512 U.S. 377 (1994). Plaintiff was convicted and sentenced to fifteen years' imprisonment for assaulting Officer Duval during the incident. Defendants are correct that *Heck* bars plaintiff's claims for use of excessive force as to Duval, and the Court earlier dismissed plaintiff's claims against Duval for that very reason.

However, plaintiff was not charged with, nor found guilty of, assaulting the remaining three Defendant Officers, and the Court is not persuaded by their argument that the *Heck* bar automatically extends to them.  Although the four officers worked together in physically detaining and arresting plaintiff, their respective actions and conduct were not identical, and it cannot be extrapolated that the jury verdict in plaintiff's criminal case regarding Duval applied to the remaining three officers in this lawsuit.

Defendants' motion to dismiss plaintiff's excessive force claims predicated on the *Heck* bar is DENIED.

### Official Capacity Claims

Plaintiff sues the Defendant Officers in their individual and official capacity.  To the extent he pleads official capacity claims, his claims are actually against the City of Houston, the municipality employing the Defendant Officers.  *See Goodman v. Harris County*, 571 F.3d 388, 396 (5th Cir. 2009) (noting that "official capacity suits are really suits against the governmental entity").

Because plaintiff has named the City of Houston as a defendant, his claims against the Defendant Officers in their official capacity are DISMISSED.

### City of Houston

Defendant City of Houston seeks dismissal of plaintiff's claims against it because he has not stated a viable municipality claim under section 1983.

Plaintiff alleges in his amended complaint that the City of Houston violated his constitutional rights by "practic[ing an] unwritten policy or custom of tolerating an excessive

7

use of force against Black men, [and] by failing to investigate and discipline officers, who use unjustified excessive force against Black men." (Docket Entry No. 51, p. 11.)  He further alleges that the City of Houston, by and through HPD, "practices an unwritten policy or custom of racially profiling Black men as a pattern and practice of enforcement and at rates twice as high as their population, by and through its allege [*sic*] Gang Task Force Units and State Court imposed areas of exclusion for their patrol."  *Id*.  He argues that these actions violated his equal protection rights.

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court established that a municipality cannot be held liable for civil rights violations under a theory of *respondeat superior* or vicarious liability.  *Id*., at 694.  To raise a viable section 1983 claim against a municipality such as the City of Houston, a plaintiff must plead specific facts establishing (1) an official custom or policy; (2) promulgated by the municipal policymaker; (3) which was the actual cause and "moving force" behind the alleged violation of a constitutional right.  *See Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017); *Pena v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018).  As shown *infra*, the Defendant Officers are entitled to summary judgment dismissal of plaintiff's claim for use of excessive force.  Because the Defendant Officers did not use excessive force against plaintiff in effecting his detention and arrest, there is no constitutional violation to support a *Monell* claim against the City of Houston.

Further, plaintiff pleads no factual allegations supporting a claim that the defendants racially profiled *him* in the underlying incident.  To the contrary, the Defendant Officers'

8

uncontested summary judgment evidence shows that they stopped plaintiff's vehicle based on an alert from their automated license plate reader. The alert indicated that the owner of the vehicle had outstanding traffic violation warrants. The officers stopped the vehicle, verified plaintiff's identity, and ordered him to exit the vehicle. Plaintiff refused, and the officers had to forcibly remove him from the vehicle. The Court pointed out this deficit of factual allegations in its order denying preliminary injunctive relief: "Nothing in the complaint shows that plaintiff was 'racially profiled' by the police." (Docket Entry No. 19, p. 3.) Plaintiff was granted leave to file an amended complaint, and his amended complaint added no additional factual allegations supporting a claim that he had been racially profiled by the Defendant Officers. The Court is of the opinion that plaintiff has pleaded his best case and that further leave to amend, even if requested, would be futile.

Plaintiff's claims against the City of Houston are DISMISSED WITH PREJUDICE.

### *Motion for Summary Judgment*

*Legal Standards*

Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The appropriate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). In sustaining this burden, the movant must identify those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party, however, "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant's burden is only to point out the absence of evidence supporting the nonmoving party's case. *Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996).

In response, the nonmovant may not rely upon mere allegations contained in the pleadings and must set forth and support by probative summary judgment evidence specific facts showing the existence of a genuine issue for trial. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Once the moving party makes a properly supported motion for summary judgment, the nonmoving party must look beyond the pleadings and designate specific facts in the record to show there is a genuine issue for trial. *Stults*, 76 F.3d at 655. Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the nonmovant's burden. *Id*.

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322. "In such a situation, there can be 'no genuine

issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.

> *Qualified Immunity*

The Defendant Officers claim entitlement to qualified immunity as to plaintiff's claims for excessive force and deliberate indifference. Plaintiff bears the burden to negate the defense of qualified immunity. *See Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017).

Determination of qualified immunity requires a bifurcated analysis: first, the court must decide "whether the undisputed facts and the disputed facts, accepting the plaintiffs' version of the disputed facts as true, constitute a violation of a constitutional right"; and second, the court must determine "whether the defendant's conduct was objectively reasonable in light of clearly established law." *Carroll v. Wellington*, 800 F.3d 154, 169 (5th Cir. 2015) (internal quotation marks and citation omitted); *see Thompson v. Mercer*, 762 F.3d 433, 437 (5th Cir. 2014). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Pratt v. Harris County*, 822 F.3d 174, 181 (5th Cir. 2016) (internal citation and quotation marks omitted). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Hanks*, 853 F.3d at 744 (internal citations and quotation marks omitted). Thus, "qualified immunity represents the norm, and courts should deny a defendant immunity only in rare circumstances." *Angulo v. Brown*, ___F.3d___, 2020 WL 6220005,

at *3 (5th Cir. Oct. 23, 2020) (quoting *Romero v. City of Grapevine*, 888 F.3d 170, 175 (5th Cir. 2018)).

A reviewing court may address the two prongs of the qualified immunity analysis in any sequence, depending on the circumstances of the particular case at hand. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Heaney v. Roberts*, 846 F.3d 795, 801 (5th Cir. 2017). Given the posture of this case, the Court will proceed first to analyze the merits of plaintiff's constitutional claims. Absent a constitutional violation, the Defendant Officers would be entitled to qualified immunity without need for the Court to address the second prong.

*Deliberate Indifference to Medical Needs*

Plaintiff alleges that the Defendant Officers were deliberately indifferent to his serious medical needs by not allowing EMS to examine and treat him at the scene, in violation of the Eighth Amendment. Plaintiff does not identify the officer who allegedly told EMS that he did not need medical attention, and he proffers no probative summary judgment supporting liability against any one of the Defendant Officers in his or her individual capacity. Nor has plaintiff presented probative summary evidence that all three of the Defendant Officers made such statement to EMS. Thus, plaintiff fails to present probative summary judgment evidence in support his individual capacity claim for deliberate indifference as to the Defendant Officers, individually or collectively.

Regardless, plaintiff had no Eighth Amendment right to medical care at that time, as he was arrested, not convicted. *See Carter v. Reach*, 399 F. App'x 941, 942 (5th Cir. 2010). In the interest of justice, the Court will liberally construe plaintiff's allegations as raising a

12

claim for deliberate indifference under the Fourteenth Amendment. *Id*. The legal standards and considerations are identical.

To establish deliberate indifference to his serious medical needs, a plaintiff must show that (1) an officer knew of facts leading to an inference of a substantial risk of serious harm to the plaintiff; (2) the officer drew that inference; and (3) the officer's actions indicate that the he intended the harm. *Thompson v. Upshur County*, 245 F.3d 447, 458–59 (5th Cir. 2001). To preclude summary judgment, a plaintiff must point to evidence from which a reasonable fact finder could conclude that the officer "refused to treat [the plaintiff], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical need." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001). Meeting this standard requires a showing that the officer was aware of a substantial and significant risk but effectively disregarded it. *Jacobs v. West Feliciana Sheriff's Dep't*, 229 F.3d 388, 395 (5th Cir. 2000). Delay in providing medical care gives rise to a constitutional violation only if the deliberate indifference resulted in substantial harm. *See Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

In his amended complaint, plaintiff claims that the Defendant Officers denied him medical care from EMS for his alleged life-threatening injuries. Specifically, he alleges he had a hyperthyroid condition that, after he was tased, caused serious life-threatening complications. (Docket Entry No. 51, p. 10.) In his response to the motion for summary judgment, plaintiff notes that the Houston Fire Department EMS report stated that plaintiff

13

told them nothing was wrong.  (Docket Entry No. 66, p. 15.)  The Court notes that the EMS report states as follows:  "HPD states person [in custody] was [complaining of] [shortness of breath] and cut.  When person approached by [EMS employee] he stated nothing was wrong and he was tough.  HPD was advised that he refused any type of care.  No pt.  Nothing further."  (Docket Entry No. 56, Exhibit E.)

Plaintiff does not directly controvert the EMS report statement; rather, he looks to the timing of the report and claims it conflicts with the timing on his jail booking.  The EMS report shows that EMS arrived on the scene at 17:06 (5:06 p.m.) on July 20, 2015, spoke with plaintiff at 17:08 (5:08 p.m.), and departed at 17:12 (5:12 p.m.).  *Id*.  Plaintiff alleges that his jail booking receipt shows that he was charged and placed on a hold at 16:58 (4:58 p.m.), such that he could not have spoken with EMS personnel at 17:08 (5:08 p.m.) because he was in jail.  Plaintiff misrepresents the document.  Plaintiff's jail booking receipt shows that he was *arrested* by defendant Officer Myrick at 16:58 (4:58 p.m.) and *booked* into jail at 18:22 (6:22 p.m.).  (Docket Entry No. 45, p. 17.)  Thus, plaintiff did not arrive at the jail until nearly 6:30 p.m., well after the time EMS reports speaking with him at the scene.  Contrary to plaintiff's contention, the jail booking receipt does not prove that he was not seen by EMS personnel at the scene, and no material fact issue is raised.

Further, plaintiff misrepresents the EMS records.  He informs the Court that the Defendant Officers "admit that plaintiff had 'laceration and . . . can't breathe'" in the record.  The EMS record actually reads, "laceration and states he can't breathe."  (Docket Entry No. 54-1, p. 4.)  The Defendant Officers did not report that plaintiff could not breathe – they

14

reported that *plaintiff* stated he could not breathe.  The Defendant Officers made no independent determination that plaintiff could not breathe, and plaintiff's allegation is refuted by the record.  Likewise, plaintiff's argument that the Defendant Officers "do not deny they used excessive force" (Docket Entry No. 66, p. 13) is patently incorrect and unsupported in the record.  As quoted by plaintiff in his response, Officer Mejia agreed at trial that "it took quite an effort to detain and handcuff [plaintiff]," *id*., p. 14; although not quoted by plaintiff, Mejia's next statement was that plaintiff "was not cooperating whatsoever." (Docket Entry No. 52-4, p. 155.)

Even assuming the Defendant Officers did not allow EMS to examine plaintiff at the scene, plaintiff fails to demonstrate deliberate indifference to his serious medical needs.  He complains that being tased at the scene created a life threatening injury due to his hyperthyroidism.  However, he fails to show that the Defendant Officers were aware of his hyperthyroidism.  Absent that knowledge, the officers could not have inferred that tazing him, or their use of force, created a life threatening injury and that not allowing EMS to examine him created a substantial risk of serious harm.

Elsewhere, plaintiff claims that his injuries from the use of force were bruising, a bloody nose and lip, a cut to his ear, scrapes on his back, and "taser marks." (Docket Entry No. 51, p. 7.) To the extent plaintiff claims that these injuries constituted serious medical needs, he again fails to raise a genuine issue of material fact that the officers were aware of a substantial and significant risk to his health by not allowing EMS to examine him, and hat they effectively disregarded the risk.  *Jacobs*, 229 F.3d at 395.

15

Plaintiff acknowledges that he was subsequently seen by medical staff during his booking into jail an hour and 24 minutes later.  He claims, however, that he was not provided any care and was told the examination was for screening purposes and medications, not treatment.  The Defendant Officers were not involved in this exchange, and plaintiff did not name a jail health care provider as an additional defendant.  Nor does he plead any factual basis for municipality liability under *Monell* as to this particular instance.  Consequently, no viable deliberate indifference claim is raised as to plaintiff's medical care during his jail screening.

The Defendants are entitled to summary judgment dismissal of the claim, and plaintiff's claim for deliberate indifference as to his medical needs is DISMISSED WITH PREJUDICE.

*Excessive Force*

Plaintiff claims that the Defendant Officers used excessive force during his arrest. The Fourth Amendment guarantees the right to be free from excessive force during an arrest. To succeed on the merits of a Fourth Amendment claim, a plaintiff must show (1) an injury that (2) "resulted directly and only from a use of force that was clearly excessive to the need," the excessiveness of which was (3) objectively unreasonable.  *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016); *Poole v. City of Shreveport*, 691 F.3d 624, 627–28 (5th Cir. 2012).  Because some use of force by law enforcement is reasonable when necessary to effect an arrest, a court must decide whether the force used was clearly excessive to the need.  *See Scott v. Harris*, 550 U.S. 372, 382–83 (2007). The court must evaluate the use of force "from

16

the perspective of a reasonable officer on the scene," and not "with the 20/20 vision of hindsight." *Griggs*, 841 F.3d at 312.  As recently confirmed by the Fifth Circuit, a use of force is more likely to be reasonable when officers use "measured and ascending" actions that correspond to a suspect's level of compliance or resistance.  *Angulo*, 2020 WL 6220005, at *5; *see also Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010) (finding use of force reasonable when it involved "measured and ascending responses" to a plaintiff's noncompliance).

The court's Fourth Amendment inquiry is fact intensive and focuses on whether the officers' actions were objectively reasonable, considering the particular circumstances at the time force was used.  *Id.*  In assessing objective reasonableness, courts look to the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to flee. *Graham v. Conner*, 490 U.S. 386, 396 (1989).  The officer's motive or intention is irrelevant to the inquiry.  *Id.*, at 397.

The Defendant Officers submitted a copy of the Houston Police Department Report for the incident, written shortly after the incident.  (Docket Entry No. 52-3, Exhibit C.)  Each officer contributed a synopsis of his or her own relevant involvement in the use of force, as follows:

> <u>Officer Myrick</u>:      I approached the driver side of the vehicle and Officer Duval approached the passenger side.  As I got to the driver side window the suspect started to scream and throw his hands in the air stating, "Why the fuck did you pull me over you while mother fucker.  Ya'll are always trying to fuck with us.  Fuck you."  I told the suspect he needed to calm down and asked what his name was.  He suspect stated,

"My name is Cecil Max-George."  I then notified the suspect that he had warrants on his vehicle that matched his name and asked him to step out of the car for his safety and officers.

The suspect continued to scream and throw his hands stating, "Fuck some warrants that happened in the flood.  Mother fucker I'm not going anywhere and ya'll aren't taking me for some warrants."  I asked the suspect to calm down again and he needed to step out of the car.  The suspect screamed "Fuck you I'm not getting out and you are not taking me."
I then advised dispatch over the radio that officers needed units to come to the scene.

Officer[s] Matthews and Mejia, Unit # 14D37G, arrived on scene soon after.  Officer Matthews then attempted to speak with the suspect who also cursed Officer Matthews.  The suspect refused Officer Matthew's order to exit the vehicle and continued to throw his hands in a violent manner up and down refusing to exit.

\*   \*   \*   \*

Officers again asked the suspect to exit the vehicle and he refused.  Officer Matthews attempted to place handcuffs on the suspect while he was still in the driver seat and the suspect struck Officers [*sic*] Matthews['s] hand away with his hand.

Officer then observed the suspect grab Officers [*sic*] Matthews by his ballistic vest near the neck.  I immediately grabbed the suspect['s] feet and started to pull him out of the vehicle.  The suspect was holding on to the headrest of the driver seat and screaming.  I continued to try and pull his legs ordering him to stop kicking and stop resisting.  The suspect broke his leg free and kicked me in the left forearm causing pain.

I grabbed the suspect['s] legs again and ordered him to stop resisting.  I heard Officer Mejia who was inside of the suspect['s] vehicle yell, "Taser taser."  Then I let go of the suspect['s] legs and could hear the conducted energy device (CED) deploy.  I then heard Officer Mejia yell that the taser did not work.  Officers on scene during the CED event consisted of myself, Duval, Matthews, Mejia, and Callahan.

The suspect at this time was half inside the vehicle and his legs were out.  I along with Officer Matthews and Officer Callahan pulled the suspect out of the vehicle and onto the ground,  The suspect continued to tense his arms holding them close to his chest and kicking his feet.  The suspect at one point rolled on to his side on top of my right hand causing my wrist to bend forward causing pain.  I continued to order the suspect to stop resisting and place his hands behind his back.  I along with Officer[s] Duval,

Matthews, Mejia, and Callahan were holding the suspect on the ground attempting to gain control of his arms and legs. I was holding the suspect['s] legs on the ground with my body weight to gain control.

Officer Mejia and Officer Callahan were able to handcuff the suspect while he was on the ground. I heard the suspect yell to Officer Mejia that he was going to kill her and when he got out he was going to find her and kill her. The suspect was then placed into the backseat of Officer[s] Matthews and Mejia['s] patrol car.

*Id.*, pp. 9–10.

Officer Callahan:     Specific reason that justified use of force, including the suspect['s] actions and behaviors: When I arrived on scene I saw Officer Myrick and Officer Matthews on the driver side of the suspect['s] black pickup truck, and the suspect actively resisting. I ran up to the officers and began to assist them in getting the suspect out of the vehicle, as he was actively resisting. The suspect was still in the vehicle and officers were giving multiple loud verbal commands for the suspect to get out of the vehicle [and] to stop resisting. Officers continued to pull the suspect out of the vehicle and the suspect was holding on to the seat, and the headrest of the seat, anything he could to keep from being taken out of the vehicle. I had the suspect['s] right arm in an attempt to break it free from the grasp he had inside the vehicle, so we could get him out of the vehicle. Officer Mejia was inside the passenger side of the truck, trying to get the suspect out. Officer Mejia then deployed her taser on the suspect, but it had little effect on the suspect. But I was tasered by the taser wire for a brief moment, as I had a grasp of the suspect.

I, Officer Callahan, and Officer Myrick, pulled the suspect out of the vehicle and to the ground. The suspect came out of the vehicle and was on his back on the ground, and refused to turn over and continued to actively resist. I and Officer Mejia were able to get a cuff on the suspect['s] hand, and then placed another set of handcuffs on the suspect['s] other hand, then secured them together. Officers had to force handcuff the suspect as he would not comply with officers['] commands. Officers had to forcefully move the suspect['s] hands behind his back in order to secure them. Once the suspect was cuffed with the two sets of handcuffs, officers were able to secure the suspect in the conventional manner with one set of handcuffs.

*Id.*, pp. 12–13.

Officer Duval:     I observed the suspect hit [Officer] Matthews and begin to actively resist by kicking his legs. The suspect then began to hold onto the driver side seat refusing my orders to stop resisting and exit the vehicle.

19

I was trying to pry the suspect['s] hands free from the driver seat headrest when I heard [Officer] Mejia announce she was going to taser the suspect. I then let go of the suspect['s] hands and observed [Officer] Mejia deploy her [CED] striking the suspect in the abdomen with little effect. The suspect continued to disregard my commands to stop resisting by kicking his legs and holding onto the seat.

I was still trying to pry the suspect['s] hands from the seat when other officers were able to pull the suspect out of the car and onto the ground.

While trying to get the suspect in custody, I went to secure the suspect['s] legs, which he was using to kick other officers. While down on the ground, I was kicked twice in the right arm by the suspect causing pain and injury to the inside of my right arm. I was able to secure the suspect['s] legs by crossing them and sitting on his ankles using my body weight, keeping both legs pinned in place.

*Id.*, p. 14.

Officer Matthews:    While approaching the vehicle officers observed the driver (listed suspect) throwing his hands up and down in a very aggressive manor [*sic*].

I heard the suspect state that "he was not getting out of the fucking car," and that "he was not letting these white officers arrest him for no fucking warrant." Being a black officer, I attempted to calm the suspect down. Suspect still would not comply. I opened the driver door and grabbed the suspect's left hand. Having cuffs in my right hand I attempted to place cuffs on the suspect['s] left wrist. The suspect slapped my hand and pushed me off.

I told the suspect to comply with my commands. Now with the suspect sitting in the driver seat facing me, I grabbed the suspect['s] right hand and he pulled away. Grabbing his left arm the suspect grabbed my ballistic vest and punched me in the throat. The suspect than [*sic*] grabbed the headrest and would not get out of the vehicle.

With a closed right fist, I struck the suspect in the upper torso area (approximately 3 to 4 times), while still giving verbal commands. The suspect stood up pushing me back. I grabbed the suspect['s] right arm again and attempted to bring it behind his back but the suspect grabbed by [*sic*] arm and threw his body back. The suspect pulled me up over his shoulder throwing me to the ground. I informed other officers that I was on the ground.

20

I heard Officer Mejia, yelled "taser, taser," which she than [*sic*] tased the suspect, but the suspect was still not complying. I heard Officer Mejia say that the taser did not work. I got up off the ground and assisted other officers with pulling the suspect out of the vehicle and escorting him to the ground. While on the ground the suspect still was not complying with officers['] commands to turn on his stomach and place his hands behind his back.

I grabbed the suspect['s] right arm and pulled it to where he rolled over to his stomach. After a brief struggle with the suspect on the ground Officer Mejia and Callahan placed the suspect in cuffs. At this point I heard the suspect yell at Officer Mejia, that he was going to find her and kill her. I took control of the suspect, I helped him off the ground and walked with him to my patrol car. I searched the suspect (for officer safety) and placed him in the back seat of my patrol car.

*Id*., pp. 16–17.

Officer Mejia:        Upon arrival, we approached the suspect vehicle with the primary unit (14D36E) (Officer Duval and Officer Myrick). I observed the suspect to be very aggressive and refusing to cooperate with the commands that were given to him. I also observed the suspect to only listen to my partner (Officer Matthews). The suspect appeared as if he was going to listen, while Officer Matthews gave him verbal commands to step out. Myself and all the other officers on scene (Officer Myrick, Officer Duval) let Officer Matthews attempt to get the suspect to step out of the vehicle without having to force him out.

\*   \*   \*   \*

I observed Officer Matthews ask the suspect politely to step out of the vehicle and then the suspect refused once again. Officer Matthews opened the driver side door and attempted to get the suspect out of the vehicle. The suspect started yelling and cussing. Then [*sic*] observed the suspect push Officer Matthews causing Officer Matthews to step back from the suspect's strong push.

I immediately ran on the other side of the vehicle, stepped inside the vehicle through the passenger side door. I grabbed the suspect's right arm with my two hands, and the suspect kept pulling away. The suspect then pushed me causing me to almost fall back. The suspect was then pulled out of the vehicle, still refusing to comply. The suspect was very strong and continued to push all the officers around. Once I saw Officer Matthews wrap his arms around the suspect's upper body area, and the suspect lean forward bucking Officer Matthews off, I told the suspect taser taser. I discharged my CED towards the suspect['s] stomach and leg area. I saw the darts both hit the suspect, and the suspect had no reaction to the CED.

21

The suspect tried to get back into his vehicle.  I grabbed the suspect['s] right hand and was able to put a handcuff on.  Even with all of the help we were still unable to handcuff the suspect['s] other hand, until he was taken down to the floor withe [*sic*] the body weight of 3 male officers.  The suspect was finally on the floor and was still refusing to release his left hand to be handcuffed.  I struck the suspect twice in the upper torso area as I gave him commands to release his other hand.  I put my knee on top of the suspect's back, trying to prevent him from getting up until both hands were handcuffed.

Officer Callahan was finally able to grab the suspect's left hand, and together we were able to have the suspect handcuffed.  Once the suspect was handcuffed Officer Matthews put him in the back of our patrol vehicle.

*Id*., pp. 18–19.

A jury found plaintiff guilty of assaulting Duval.  During the trial, Duval testified that when they stopped plaintiff's vehicle and told him about the warrants, plaintiff became irate, started screaming and cussing, and told the officers he was not getting out of his vehicle. (Docket Entry No. 52-4, pp. 71–72.)  Duval stated they called for backup units to assist, and Officers Matthew and Mejia arrived a few minutes later.  Matthews attempted to talk plaintiff into exiting the vehicle, but plaintiff ultimately refused.  Matthews opened plaintiff's door and tried to remove him by the wrist, but plaintiff hit Matthews's hand.  *Id*., pp. 72–74. Plaintiff then grabbed Matthews's uniform vest and pushed him away.  At that point, all four officers attempted to remove plaintiff, but plaintiff grabbed on to the back of his seat and held on.  *Id*., p. 74.  Duval unsuccessfully tried to pry plaintiff's interlocked fingers off the seat back, and Mejia deployed her taser.  Duval testified that the taser was "ineffective," as plaintiff had no physical reaction.  *Id*., pp. 75–76.  The officers eventually pulled plaintiff out by the legs, but he stood back up and fought their efforts to handcuff him.  *Id*., p. 77–78.

Plaintiff was eventually brought to ground, but he continued kicking and trying to get back up. *Id*., p. 79. Duval attempted to grab plaintiff's leg so he could be rolled over on his stomach for handcuffing, but plaintiff looked at Duval and "donkey-kicked" Duval twice. *Id*., p. 80. Duval eventually sat on plaintiff's ankles to keep them immobilized. He testified that, because plaintiff was fighting them so much, they had to use two pairs of handcuffs to restrain him. Plaintiff kept trying to "buck" Duval off his legs, but Duval did not move. *Id*., p. 81.

Plaintiff testified at his trial. He stated that the officers told him to exit the vehicle but he refused, as he wanted to continue explaining his side of the warrants issue without leaving the vehicle:

> A:    [The officer] said, Listen you got a warrant, you got to get out of here, I mean, you got to get out of your car.
>
> I was, just, like, Listen, can you give me just a second to explain this? I said, Listen, I didn't know anything about these warrants and I wish I would – I wish I would have because what I'm trying to do, I'm really trying to – I was really trying to plea bargain with him so I could call my parole officer.

(Docket Entry 52-4, p. 207.) Plaintiff stated that the officer became angry and spoke loudly, at which point plaintiff told him "to get his white ass away from my window." *Id*., p. 209. The officers walked away from the vehicle to speak with other officers who had just arrived at the scene. *Id*., at 212. Plaintiff testified that a third officer, a black officer, approached the vehicle and asked plaintiff "is there any that we can – you can get out of this vehicle?" The officer asked him to get out of the vehicle, but plaintiff continued to talk instead of exiting

the vehicle.  *Id*., pp. 215–16.  Plaintiff testified that two officers began trying to pull him from the vehicle by his legs and shirt collar, and he reacted by grabbing on to the back of his seat.  *Id*., pp. 217–18.  He stated that someone began punching his arm, torso, and head, telling him to "let go, let go, let go, let go."  *Id*., p. 220.  He let go of the seat back after an officer tased him, and the officers pulled him out of the vehicle.  *Id*., p. 222.  Although he was pulled out down to the ground, he immediately stood back up until an officer tased him again and plaintiff went back down to the ground.  *Id*., p. 224.  He stated that he was "jerking" on the ground, rolling back and forth trying to remove the taser dart.  *Id*.  Two officers began hitting him, which he tried to block with his hands.  *Id*., p. 225.  The officers rolled him on to his stomach and handcuffed him.  He testified that someone had a knee on his neck and he repeatedly told them he couldn't breathe.  He felt another taser dart strike him, and they placed him in a patrol car a couple minutes later.  *Id*., pp. 226–27.

In his response to the motion for summary judgment, plaintiff presents a statement of facts (Docket Entry No. 66, p. 2).  In his statement, he alleges that the Defendant Officers conspired to forcibly remove him from his vehicle by using excessive force, denying him medical attention from on-scene EMS, and holding him on homicide charges for which he never had a probable cause hearing.  He alleges elsewhere that he was "racially profiled," sustained "life-threatening injuries" from the use of force, and that the Defendant Officers retaliated against him for his use of the term "whiteass."  *Id*., p. 8.  Although plaintiff vaguely claims that "Volume IV [of the trial transcript] has been somehow tampered with," he fails to identify any transcription errors, much less evidence of tampering.  *Id*., p. 10.

24

The probative summary judgment shows that the officers were alerted to plaintiff's vehicle through an automated plate reading system. It notified the officers that plaintiff had outstanding warrants. The officers were required to place plaintiff under arrest for the warrants and transport him to jail. (Docket Entry No. 52-4, p. 53.) The officers stopped the vehicle, verified plaintiff's identity, and asked plaintiff to exit the vehicle. Plaintiff refused, and was screaming, cursing, and throwing his hands around. The officers did not confront plaintiff at that point, and called for backup units. Following plaintiff's repeated refusals to exit the vehicle, the officers began trying to remove him. He resisted, and acknowledges that he held on to the seat to avoid being pulled out. The Defendant Officers began using stronger force to remove him, but he continued to resist. He kicked out at the officers, and defendant Mejia deployed her taser to promote plaintiff's extraction. The taser did not subdue plaintiff, nor did a second deployment. Ultimately it took five officers to remove plaintiff from his vehicle, apply handcuffs, and place him in a police vehicle for transport. Plaintiff physically resisted the officers' efforts to remove him, injuring at least two of the officers. The chronology shows that the officers' responses were measured and ascending as necessary to meet plaintiff's continued resistence and physical efforts to thwart the officers. Plaintiff does not deny that he refused to exit the car or that he actively resisted the officers' efforts to remove him.

Although the initial stop was for outstanding traffic warrants, a minor offense, plaintiff's refusal to cooperate quickly escalated from verbal to physical resistance, and his conduct posed a threat to the safety of the officers. Moreover, because plaintiff refused to

leave his vehicle, the officers did not know whether he had access to a weapon he could have used against him.  The officers used reasonable force to remove plaintiff from the vehicle and in restraining him with handcuffs, and the force used was no more than what was necessary under the circumstances to bring plaintiff under control for his safety and the safety of the officers in order to arrest and transport him.

Plaintiff argues that the officers used unnecessary and excessive force in arresting him.  However, absent from plaintiff's argument is any discussion as to exactly what force was unnecessary and why it was unnecessary under the facts.  Indeed, at no point in the chronology of the incident does plaintiff state that he had surrendered to the officers without further resistence such that force became unnecessary.  Defendant Matthews testified at trial that, even after plaintiff had been handcuffed, he continued kicking the officers.  (Docket Entry No. 52-4, p. 115.)

Plaintiff fails to demonstrate a genuine issue of material fact as to whether the Defendant Officers' actions were objectively reasonable given the totality of the circumstances.  *See Griggs*, 841 F.3d at 312.  The Defendant Officers therefore are entitled to summary judgment dismissal of plaintiff's Fourth Amendment claims.  Because no constitutional violation is established, they are also entitled to the defense of qualified immunity.

*Racial Profiling*

Plaintiff also contends that the Defendant Officers discriminated against him and violated his equal protection rights because he was "a black man."  He appears to argue that the traffic stop, use of force, and arrest were solely the result of racial profiling.

In support, plaintiff submits a one-page exhibit entitled, "Houston Police Department 2017 Annual Racial Profiling Report."  Contrary to plaintiff's assertions, the document does not prove, or raise a material fact issue, as to HPD encouraging and tolerating racial profiling against black men. The incident in this lawsuit occurred in July 2015; the data provided on the exhibit covers 2017, with a percentage comparison to 2016.  Moreover, the "Traffic Stops By Race & Gender" data indicates that 73,702 African males were stopped and 89,519 Caucasian males were stopped.  The data exhibit does not support a claim of racial profiling as to African males in Houston for the year 2017, much less for the year 2015.

Moreover, plaintiff presents no probative summary judgment evidence that he was a victim of racial profiling by the Defendant Officers on July 20, 2015. To the contrary, his vehicle was stopped based on an automated license plate reader alert regarding outstanding traffic warrants.  Plaintiff refused to cooperate with the officers and refused to obey orders to exit his vehicle, and it was necessary for the Defendant Officers to use force to physically remove plaintiff from the vehicle. No "racial profiling" is shown, and plaintiff's conclusory allegation that he was racially profiled is insufficient to preclude the granting of summary judgment against him.

27

Because no constitutional violation is shown, the Defendant Officers are entitled to the defense of qualified immunity.  The Defendant Officers are entitled to summary judgment dismissal of plaintiff's equal protection claim premised on racial profiling.

*First Amendment Retaliation*

Plaintiff also appears to raise a First Amendment retaliation claim against the Defendant Officers for their use of force.  He contends that they used force against him in retaliation for his referring to one of the officers as "whiteass."

The United States Supreme Court recently addressed the contours for a First Amendment claim against police in *Nieves v. Bartlett*, ___U.S. ___, 139 S. Ct. 1715 (2019):

> [A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech. To prevail on such a claim, a plaintiff must establish a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's "subsequent injury."  It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury. Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.

*Nieves*, 139 S. Ct. at 1722.  "The plaintiff must show that the retaliation was a substantial or motivating factor behind the [complained of actions], and, if that showing is made, the defendant can prevail only by showing that the [action] would have been initiated without respect to retaliation."  *Id*. at 1725 (quoting *Lozman v. Riviera Beach*, 585 U.S. __, 138 S. Ct. 1945, 1952–1953 (2018).  *See also Hartman v. Moore*, 547 U.S. 250, 256 (2006) (recognizing that although it "may be dishonorable to act with an unconstitutional motive,"

28

an official's "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway").

Plaintiff here does not meet his burden of proof as to causation; that is, he fails to show that, but for a retaliatory animus, the adverse action against him would not have been taken. The probative summary judgment, as well as plaintiff's own factual allegations, clearly establish that the Defendant Officers forcibly removed plaintiff from his vehicle when he refused their orders to exit the vehicle; no action was taken against him when he used the term "whiteass." To the contrary, defendant Matthews subsequently approached plaintiff in an attempt to gain his cooperation. Plaintiff does not establish with probative summary judgment that his use of the racial term "whiteass" was a substantial motivation behind the officers' use of force in removing him from the vehicle.

Plaintiff further misrepresents a Harris County Assistant District Attorney's pleading as stating the jail booking receipt showed plaintiff was actually innocent of the offense. According to plaintiff, the assistant district attorney stated: "Applicant provides a booking receipt that does say 'hold for homicide' under the charge summary review. Applicant's booking ticket was apparently in the pocket of his pants. . [*sic*] his booking ticket demonstrates he is actually innocent of assaulting a peace officer." (Docket Entry No. 66, p. 9.) The actual pleading made no such statement; the assistant district attorney stated, "Applicant's booking ticket was apparently in the pocket of his pants and *Applicant fails to show how the information on* his booking ticket demonstrates he is actually innocent of assaulting a peace officer." *Id.*, Exhibit E, p. 24.

29

Plaintiff further argues that his jail booking receipt proves the Defendant Officers retaliated against him.  The booking receipt, dated July 20, 2015, at 1822 (6:22 p.m.) indicates under Charge Summary Review, "Hold for Homicide."  (Docket No. 45, p. 17.) The HPD Report for the incident shows that plaintiff "was arrested for assault on a public servant; ADA Acklin accepted charges."  (Docket Entry No. 52-3, p. 6.)  Under charge code, the report indicates "hold – homicide."  *Id*.  Defendant Myrick further stated, "I then received a hold from Homicide Division Sgt. Robles."  *Id*., p. 11.  It is unclear in the record why it was necessary for Homicide Division Sergeant Robles to give Myrick a "hold," but it is clear that plaintiff was neither charged with homicide or held on homicide charges.  In particular, plaintiff proffers no probative summary judgment evidence, and nothing in the record indicates, that the Defendant Officers charged him with homicide.  Plaintiff's booking receipt is not probative summary judgment supporting his claim for retaliation.

Because no constitutional violation is shown, the Defendant Officers are entitled to the defense of qualified immunity.  The Defendant Officers are entitled to summary judgment dismissal of this claim.

### *State Law Claims*

Plaintiff seeks monetary relief under the Texas Tort Claims Act for the Defendant Officers' alleged negligent deployment of a taser against him during the incident.  28 U.S.C. § 1367(c)(3) specifically grants a district court the discretion to retain or decline supplemental jurisdiction once it has dismissed all claims over which it has original jurisdiction, such as plaintiff's section 1983 claims here.

"As a general rule, a federal court should decline to exercise jurisdiction over pendent state claims when all federal claims are disposed of prior to trial." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *Brim v. ExxonMobil Pipeline Co.*, 213 F. App'x 303, 305 (5th Cir. 2007). The Fifth Circuit has stated that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (internal quotations and citations omitted).

For these reasons, the Court declines to exercise jurisdiction over plaintiff's state law claims in this case.

### *Conclusion*

The Court ORDERS as follows:

1.  Defendants' motion to dismiss (Docket Entry No. 63) is GRANTED IN PART and DENIED IN PART.

2.  Plaintiff's claims against defendants for violation of state and federal criminal statutes and for civil conspiracy under 42 U.S.C. § 1985(3) are DISMISSED WITH PREJUDICE.

3.  Plaintiff's *Monell* claims against the City of Houston are DISMISSED WITH PREJUDICE.

4.  Defendants' motion to dismiss plaintiff's excessive force claims against the Defendant Officers as barred by *Heck* is DENIED.

5.  Defendant's motion for summary judgment (Docket Entry No. 52) is GRANTED in all respects, and plaintiff's claims against the defendants are DISMISSED WITH PREJUDICE.

6.      Any and all pending motions are DISMISSED AS MOOT.

7.      This lawsuit is DISMISSED WITH PREJUDICE.

Signed at Houston, Texas on October 28, 2020.

_____
Gray H. Miller
Senior United States District Judge

32